

NUMBER 13-12-00230-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

**CORINA LAM LOPEZ,**                                              **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                             **Appellee.**

## On appeal from the 105th District Court
## of Kleberg County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Benavides and Longoria**
**Memorandum Opinion by Justice Benavides**

Appellant, Corina Lam Lopez, appeals her conviction for capital murder. *See* TEX. PENAL CODE ANN. § 19.03 (West 2011). By five issues, which we re-number as four, Lopez asserts that: (1) the trial court erred in permitting the state to call co-defendant George Garza as a witness knowing that Garza would invoke his Fifth Amendment privilege against self-incrimination; (2) the trial court erred in omitting a

lesser-included offense instruction for felony murder in its charge; (3) the evidence is insufficient to find Lopez guilty as a party; and (4) trial counsel rendered ineffective assistance of counsel.   We affirm.

## I. BACKGROUND

In February 2011, a Kleberg County grand jury indicted Lopez for the capital murder of Susan Rousseau.   Rousseau's murder took place more than five years prior, after Rousseau's boyfriend, Oscar Peña, found her body lying lifeless in a pool of blood on the floor of her Kingsville, Texas trailer home.

The evidence at trial showed that Lopez and Peña were one-time boyfriend and girlfriend.   Sometime in September 2005, however, Peña and Lopez ended their nearly decade-long relationship.   After the breakup, Peña began dating Rousseau, who worked with him at the Naval Air Station in Kingsville.

The State presented evidence that Lopez did not take Peña's break-up well. According to Peña, on November 8, 2005, he and Rousseau were at Rousseau's trailer home one night, when they walked outside to discover Lopez's Jeep Cherokee drive by Rousseau's home.   Peña testified that Rousseau told him that it was not the first time that the Jeep had passed by her place.   Peña recalled another incident at a gas station, in which Lopez showed up and asked Peña why he hated her.

Lopez's friend, Samantha Truesdale, also testified.   Truesdale recalled that on November 4, 2005, Lopez gave her a typed letter to place at Rousseau's door.   The letter was admitted into evidence as State's Exhibit 10.   The letter makes references to Peña and Rousseau's relationship and is peppered with vulgarities.   The letter

2

concludes by instructing Rousseau not to "call [Peña]," "hang out with him," and if she complied, she would be "left alone." The typed letter is signed by: "ME."

Armando Garcia also testified. Garcia did not know Lopez or Rousseau prior to this case, but testified that on November 16, 2005, he was looking for work in Kingsville and was approached by a woman, later identified as Lopez, in a brown truck. According to Garcia, the female driver offered to give him a ride to his destination in exchange for delivering an envelope to a woman, later identified by Garcia as Rousseau, at the Oasis Trailer Park in Kingsville. Garcia agreed to the deal and delivered the letter to Rousseau personally. Garcia testified that once Rousseau received the letter, she asked him who instructed him to give him the letter. Garcia told him it was Lopez. Lopez, who was waiting nearby in her truck, then sped off. Rousseau then called the police. Police arrived, questioned Garcia, and issued him a criminal trespass citation. A month later, police again interviewed Garcia, who identified Lopez in a photo lineup as the woman who instructed him to deliver the letter. The trial court admitted this letter as State's Exhibit 11. The letter again references Peña as well as the writer's and Rousseau's relationship with him.

The State also elicited testimony from Oasis Trailer Park's former property manager, Heather Marshall. Marshall testified that Rousseau had asked her to "keep an eye on her RV." Marshall recalled that on November 16, 2005 she noticed a champagne-colored truck drive up to Rousseau's trailer, pull out, and then leave the park. Marshall identified Lopez as the driver of the truck. Marshall testified that the truck returned later that day to the park along with a male passenger, later identified as Garcia. Marshall stated that Susan asked Marshall later to tell her what she saw.

3

Marshall spoke to the police about the incident. Marshall recalled seeing Lopez drive through the Oasis Trailer Park for a third time in a green Jeep along with a little boy. Marshall testified that the Jeep had all of the lettering and decals removed from vehicle's body. At this point, Rousseau asked Marshall to move her trailer to a new lot, which she did.

Peña testified that he worked the late shift (3:30 p.m. to 1:00 a.m.) on the night of December 6, 2005. Peña remembered that Lopez called him that night to find out when he would get off of work and asked Peña to visit her that night. Peña declined the offer. According to Peña, Rousseau also worked that night at the Naval Air Station, but left work earlier. Peña testified that he attempted to call Rousseau after work around 1:00 a.m. on December 7, 2005, but she did not answer his call. As a result, Peña left work and went home. The next morning, he visited Rousseau at her trailer home to discover her cold, lifeless body lying in a pool of blood on the floor of her trailer home. Peña witnessed a small wooden baseball bat lying next to Rousseau's head. Peña called 9-1-1.

Police arrived, secured the crime scene, and collected evidence. Kingsville Police Officer Michael Tamez was one of the first officers to respond. Officer Tamez described the scene as "gruesome," and noted that a bat[1] was found next to Rousseau's head and that the telephone cable running into Rousseau's trailer was severed. Police discovered a book that was face-down in Rousseau's bed, a shotgun located near Rousseau's bed, and a running Crock Pot that was cooking meat and vegetables in the

---

[1] Police later interviewed Mike Keiper, who had an undefined relationship with Rousseau. According to Detective Salinas, Keiper confirmed that he had loaned Rousseau the bat and a shotgun previously as tools for self-defense.

4

kitchen. The door to Rousseau's trailer appeared to be forced open. According to Kingsville Police Sergeant Tamara Myers, a piece of foam insulation surrounding the trailer's front door was ripped out and found on the steps leading up to the front door. Sergeant Myers testified that investigators were able to open Rousseau's door without having to turn the knob. Police also discovered that Rousseau had a surveillance camera set up in her trailer, but the video retrieved did not assist police due to its poor quality.

Photos of the crime scene depict significant amounts of blood splatter throughout the walls near the location of Rousseau's body. Lisa Harmon Baylor, a forensic scientist with the Texas Department of Public Safety, testified that she tested all of the DNA samples submitted related to this case, including a DNA sample from Lopez. According to Baylor, Lopez's DNA was not linked to the Rousseau crime scene.

Nueces County medical examiner, Ray Fernandez, M.D., later performed an autopsy on Rousseau's body. According to Dr. Fernandez, Rousseau's body had multiple contusions and abrasions throughout the body, including her face, multiple skull fractures, and contusions to the left side of her brain. Dr. Fernandez testified that Rousseau's injuries were consistent with blunt trauma caused by a blunt object such as the wooden bat found at the scene. Dr. Fernandez listed Rousseau's cause of death as blunt head trauma caused by homicide.

Police initiated contact with Lopez the day following the discovery of Rousseau's body. Kingsville Police Corporal Mark Frost also interviewed Lopez that day. During the interview, Lopez denied being in the area of the trailer park the night before Rousseau's murder and also denied knowing who killed Rousseau. With Lopez's

5

consent, police searched her apartment, Jeep, and cell phone. According to Corporal Frost, two phone numbers were listed in her cell phone that night: one belonging to Peña, and another to a caller listed as "George." Lopez told Corporal Frost that "George" was a guy who was interested in buying Peña's Chevrolet Camaro and had left town the previous Sunday with her daughter. During the course of searching Lopez's apartment, police found a Wal-Mart receipt with a time-stamp of 11:59 p.m. on December 6, 2005.

Sergeant Myers and Kingsville Police Department Detective Vilma Salinas reviewed surveillance video from Wal-Mart from December 6, 2005. The investigators were able to spot Lopez in the surveillance video walking alongside an unknown male. According to Detective Salinas, Lopez had previously told investigators that she had gone to Wal-Mart alone that night.

During the police's investigation, several calls were made to the Kingsville Police Crimestoppers tip line. Virginia Rowley was in charge of answering phone calls made to that line from anonymous tipsters. Rowley testified that she received a call on December 8, 2005 from an unknown caller who said that "Ricky Segura" beat Rousseau with a baseball bat, and then, the caller hung up. Rowley testified that a second call came in thirty minutes later wherein the caller, who sounded like the previous caller, gave the same name of "Ricky Segura" to her, but said that Segura had been at a party the night before talking about the murder. According to Rowley, the caller described Segura as a gang member who had been staying at a local motel in Kingsville.

On December 12, 2005, another call was made to the tip line, wherein the caller stated that Ricky Segura found out that her brother had called the Crimestoppers line

6

previously and beat him up. Rowley stated that the caller sounded like a woman. A fourth call was made to the tip line on January 4, 2006. Rowley recognized the voice as that of the previous caller, and compared the voice with that of Lopez's, whose voice was recorded by Corporal Frost during his interview. Rowley testified that the voices were similar. A fifth call came in on January 10, 2006. Again, Rowley testified that the voice sounded the same, and that the caller indicated that Segura was seen at a store in Alice or San Diego, Texas. A sixth call came in on February 15, 2006 in which the caller told police that Segura was hiding at Loyola Beach and dropped a necklace with the name "Ricky" on it at the crime scene.

When the sixth call came in to the Crimestoppers line, Rowley notified Detective Salinas about the phone call. Detective Salinas acted on a hunch and traveled around town looking for pay phones to see if she could identify the caller. Rowley kept the caller on the line while Detective Salinas and Sergeant Myers traveled around Kingsville. The call abruptly came to end, when Detective Salinas grabbed the phone from the caller and asked Rowley to confirm that it was her. Once Rowley confirmed her identity to Detective Salinas, the call ended. Detective Salinas and Sergeant Myers subsequently placed Lopez under arrest. Police were unable to locate a "Ricky Segura" in the area who would match the description given to them by Lopez.

Detective Salinas eventually retrieved Lopez's cell phone records during the dates surrounding Rousseau's death. One phone number of interest on Lopez's phone records turned out to be registered to George Garza. Detective Salinas was able to find a photo of George Garza and compared it to the male subject present with Lopez in the Wal-Mart surveillance footage. According to Detective Salinas, similarities in

7

apperance existed between the two subjects.   The trial court admitted State's Exhibit 80, Lopez's cell phone records.   According to the records, the following calls were made between Lopez and Garza on the dates surrounding Rousseau's murder:

- December 6, 2005 at 11:35 p.m. lasting 44 seconds in duration;

- December 7, 2005 at 12:40 a.m. lasting 29 seconds in duration;

- December 7, 2005 at 12:43 a.m. lasting 13 seconds in duration;

- December 7, 2005 at 1:42 a.m. lasting 0 seconds in duration; and

- December 7, 2005 at 1:45 a.m. lasting 34 seconds in duration.

The State also played State's Exhibit 74—a videotaped interview conducted in August 2010 between Texas Ranger Keith Pauska and Lopez.   At the time, Lopez was incarcerated in Travis County, where she lived at the time, on the pending capital murder charges.   During the interview, Lopez told Ranger Pauska that she "loved" Peña, but admitted that he treated her badly toward the end of their relationship.   Lopez admitted that Garza, who was her daughter's friend, called her "constantly" on the night of Rousseau's murder to inquire about buying Peña's Camaro.   While the timing was unclear, Lopez admitted to going to Wal-Mart with Garza that night, and later to Rousseau's trailer park to look for Peña.   Lopez admitted that she knew Peña was at work that night, but said that she went to look for him at the trailer park anyway.   Lopez acknowledged that she knew that Rousseau had moved her trailer to a new location from its original position.   Lopez also stated that she dropped off Garza at a party at a Kingsville motel, then later picked him up from the motel and dropped him off at the Love's Truck Stop in Kingsville.   Lopez eventually admitted that after she dropped Garza off at the truck stop, she drove by Rousseau's trailer a second time to again look

8

for Peña.

Ranger Pauska asked Lopez why she did not mention Garza during her initial interview with Corporal Frost immediately following Rousseau's murder. Lopez admitted to lying to the initial investigators because she was "afraid" to tell them about Garza because her car "smelled like alcohol." Lopez described Garza as "all messed up" and "coked up" on the night of Rousseau's murder and that Garza "gets scary when he's like that." Toward the end of the interview, Lopez admitted that Garza had told her that he and a friend of his were "going to get stuff" at the trailer park, but did not specify what or where, specifically. Lopez also admitted that she had wished Rousseau was dead.

The State called Garza as a witness. Despite the grant of immunity, Garza refused to testify and cited his Fifth Amendment right against self-incrimination. *See* U.S. CONST. amend V. As a result, the trial court held him in contempt of court. Lopez did not testify.

Through the law of parties, *see* TEX. PENAL CODE ANN. § 7.02 (West 2011), the State alleged that Lopez intentionally caused Rousseau's death by hitting her with a bat, and that Rousseau's death took place in the course of, or attempting to commit, burglary of Rousseau's home. The jury returned a guilty verdict against Lopez as charged. The trial court sentenced Lopez to life imprisonment with the Texas Department of Criminal Justice—Institutional Division. Lopez filed a motion for new trial, but that motion was denied. This appeal followed.

## II.   CALLING GARZA AS A WITNESS

By her first issue, Lopez asserts that the trial court committed reversible error by allowing the State to call Garza as a witness, when it was apparent that Garza would invoke his Fifth Amendment privilege against self-incrimination.

### A.  Applicable Law and Standard of Review

As a starting point, an accused has a right to confront and cross-examine the witnesses against him.   *See* U.S. CONST. amend. VI; *Pointer v. Texas*, 380 U.S. 400, 403–04 (1965); *accord Langham v. State*, 305 S.W.3d 568, 575 (Tex. Crim. App. 2010). However, the Fifth Amendment of the United States Constitution also provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. CONST. amend. V.   To seek its protection in a criminal case, one must affirmatively assert the privilege.   *See Johnson v. State*, 357 S.W.3d 653, 657 (Tex. Crim. App. 2012).

The right to be free from comment about a failure to testify, however, is not absolute.   *See United States v. Robinson*, 485 U.S. 25, 31–32 (1988) (holding that any "direct" reference by a prosecutor's comments to the failure of a defendant to testify is too broad a reading of the Fifth Amendment and, instead, must be read in the context). An exception to the general prohibition against allowing the jury to see a witness's invocation of a Fifth Amendment privilege arises in certain instances where the State calls a witness who refuses to testify.   *Coffey v. State*, 796 S.W.2d 175, 178 (Tex. Crim. App. 1990) (en banc).   Under this exception, the State may call such a witness when "the prosecutor's case would be seriously prejudiced by a failure to offer him as a witness."   *Id.* (quoting *United States v. Vandetti*, 623 F.2d 1144, 1147 (6th Cir. 1980)).

Moreover, the Texas Court of Criminal Appeals held that a co-defendant witness who had been granted use immunity for her testimony "did not have a valid basis for refusing to testify." *Coffey*, 796 S.W.2d at 179. The *Coffey* Court cautioned, however, that even though calling a co-defendant witness who had been granted use immunity for testimony was constitutionally permissible, the State may nonetheless unfairly prejudice a defendant "in a variety of ways,"—for example, "had the State asked the witness a series of damaging questions in such a way as to invite the jury to assume that the answers to each question would have been in the affirmative." *Id.* at 179, n. 6.

## B. Discussion

Lopez argues that the trial court erred by permitting the State to call Garza as a witness despite his clear intention to invoke his Fifth Amendment right against self-incrimination because the trial court unreasonably relied upon *Coffey* in this case. The State counters that *Coffey* is binding precedent and that Garza had no such privilege to assert in this case. We agree with the State.[2]

After the State made its intentions known at trial that it would call Garza as a witness, Garza's counsel notified the trial court in open court that his client would exercise his right to remain silent regarding all questions asked in this case. At that point, the State made an application to grant Garza immunity for his testimony in this case, which was granted by the trial court. Thus, once immunized, Garza no longer had a valid basis for refusing to testify. *See Butterfield v. State*, 992 S.W.2d 448, 449–50

---

[2] To the extent that Lopez challenges the reasoning of the Texas Court of Criminal Appeals in *Coffey v. State*, 796 S.W.2d 175, 177–78 (Tex. Crim. App. 1990) (en banc) and asks this Court to overrule the precedent set forth therein, we decline the invitation. *See Ervin v. State*, 331 S.W.3d 49, 53 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) ("As an intermediate court of appeals, we are bound to follow the precedent of the court of criminal appeals."); *see also* TEX. CONST. art. 5 § 5 (court of criminal appeals is final authority for criminal law in Texas).

11

(Tex. Crim. App. 1999). At that point, Garza's refusal to testify was punishable by contempt. *See id.* Accordingly, we hold that the trial court's allowing of the State to call Garza as a witness was "constitutionally permissible" and not in error. *See Coffey*, 796 S.W.2d at 179.

Despite there being no initial error, the State nevertheless may have "unfairly prejudiced" Lopez by asking Garza "a series of damaging questions in such a way as to invite the jury to assume that the answers to each question would have been in the affirmative." *Id.* at 179, n. 6. In this case, the following exchange took place with Garza on the witness stand:

| | |
|---|---|
| [STATE'S PROSECUTOR]: | Sir, would you please state your name for the record? |
| GARZA: | George Garza, III. |
| [STATE'S PROSECUTOR]: | Mr. Garza, are you the same George Garza that is charged as a co-defendant with the defendant in this case, Corina Lam Lopez, in Cause No. 10-CRF-0374-1? |
| GARZA: | (No response.) |
| [STATE'S PROSECUTOR]: | Sir, are you also charged with the same offense, the murder of Susan Rousseau, as the defendant in this case, Corina Lam Lopez? |
| GARZA: | (No response.) |
| [STATE'S PROSECUTOR]: | I'd ask the Court to instruct the witness to answer the question. |
| THE COURT: | Mr. Garza, the Court is instructing you at this time that pursuant to the order that I signed granting you use immunity, you are order to answer the question, sir. Are you going to answer the question or |

12

|  | are you going to refuse to answer the questions, sir? |
|---|---|
| GARZA: | (No response.) |

The trial court then held Garza in contempt of court and allowed the State to proceed with its questioning:

|  |  |
|---|---|
| [STATE'S PROSECUTOR]: | Mr. Garza, do you know what happened to Susan Rousseau that caused her death on December the 7th or December the 6th of 2005? |
| GARZA: | (No response.) |

The trial court again held Garza in contempt for refusing to answer the State's question. At this point, the State passed Garza as a witness, and Lopez did not cross-examine Garza.

The *Coffey* Court cited *Washburn v. State*, 299 S.W.2d 706 (Tex. Crim. App. 1956) as an example of how the State can unfairly prejudice a defendant in its examination of a witness in this situation. In *Washburn*, the State asked the witness in a murder trial "fact[-]laden questions" from a twenty-one page statement of facts and was "in detail as to names, dates, and places." *Id.* at 707. This line of questioning, according to the court of criminal appeals, was erroneous because it "permitted" the State to "plant in the jury's mind full details as to how they claimed the crime was committed," and that the State's "only substantive evidence . . . was the answer of the witness that he refused to answer. . . ."

Based on this record, we conclude that Lopez failed to object to any questions asked of Garza by the State to properly preserve error for our review. *See* TEX. R. APP. P. 33.1(a). However, even assuming without deciding that error was properly

13

preserved, we conclude that the State's examination of Garza did not unfairly prejudice Lopez. Two questions involved the identification of Garza as a co-defendant in the case, while the third question asked if he knew what happened to Rousseau that caused her death. None of the questions asked of Garza were detailed and "fact-laden" from which the jury could have inferred Lopez's guilt and become unfairly prejudicial. *See Perez v. State*, 41 S.W.3d 712, 720 (Tex. App.—Corpus Christi 2001, no pet.) (distinguishing case from *Washburn*). Accordingly, we overrule Lopez's first issue.

### III. LESSER-INCLUDED OFFENSE INSTRUCTION

By her second issue, Lopez contends that the trial court reversibly erred by failing to *sua sponte* submit a jury charge that omitted the lesser-included offense instruction for felony murder.

#### A. Standard of Review

Our first duty in analyzing a jury-charge issue is to determine whether error exists. *See Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005) (en banc). If we find error, we analyze it for harm. *Id.* The degree of harm necessary for reversal depends on whether the error was preserved by objection. *Id.* If the error was preserved by objection, we will reverse if we find "some harm" to the defendant's rights. *Id.* If no objection was made, we will reverse only if the record shows "egregious harm" to the defendant. *Id.*

#### B. Discussion

Lopez argues that "the trial court erred in failing on its own initiative to include an instruction on the lesser-included offense of felony murder . . . because the circumstances of the present case would have supported submission of the lesser-charge."

This issue was addressed directly by the Texas Court of Criminal Appeals in *Tolbert v. State*, 306 S.W.3d 776 (Tex. Crim. App. 2010). In *Tolbert*, the intermediate appellate court held that an appellant who had no objection to the trial court charging the jury only on capital murder, rather than adding a lesser-included offense, did not operate as an estoppel to prevent the appellant from claiming on appeal that the trial court should have *sua sponte* instructed the jury on the lesser-included offense of murder. *See id.* at 779. The court of appeals further held that appellant's failure to object to the trial court's "error" in not *sua sponte* instructing the jury on the lesser-included offense of murder should have been evaluated under the *Almanza* "egregious-harm" standard. *See id.*; s*ee generally Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (en banc).

The court of criminal appeals concluded that the intermediate court's holding was erroneous because the court of appeals should have first decided whether it was "error" for the trial court not to *sua sponte* instruct the jury on the lesser-included offense of murder. *Tolbert*, 306 S.W.3d at 781*.* That analysis, in turn, required the court of appeals to determine whether a jury instruction on a lesser-included offense of murder was "applicable to the case." *Id.* (citing *Posey v. State*, 966 S.W.2d 57, 62 (Tex. Crim. App. 1998) (en banc) (holding that a trial court has a duty to *sua sponte* submit a charge setting forth the law "applicable to the case.")). The *Tolbert* Court further held that lesser-included offenses are "like defensive issues and . . . a trial court is not statutorily required to *sua sponte* instruct the jury on lesser-included offenses because these issues 'frequently depend upon trial strategy and tactics.'" *Tolbert*, 306 S.W.3d at 780 (quoting *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007)). Furthermore, the court of criminal appeals cited the following excerpt from the Dix and

15

Dawson treatise on criminal practice and procedure as instructive on this issue:

> Because of the strategic nature of the decision, it is appropriate for the trial court to defer to the implied strategic decisions of the parties by refraining from submitting lesser offense instructions without a party's request. It is clear that the defense may not claim error successfully on appeal due to the omission of a lesser included offense if the defense refrained from requesting one. Likewise, any error in the improper submission of a lesser included instruction is waived if the defense fails to object to the instruction.

*Tolbert*, 306 S.W.3d at 781 (quoting 43 GEORGE E. DIX & ROBERT O. DAWSON, CRIMINAL PRACTICE AND PROCEDURE § 36.50 (West Supp. 2006)); *see also* 43 GEORGE E. DIX & JOHN M. SCHMOLESKY, CRIMINAL PRACTICE AND PROCEDURE § 43.47 (West 2011). Simply put, a trial court has no duty to *sua sponte* instruct the jury on a lesser-included offense absent a request by the defense for its inclusion in the jury charge. *See Tolbert*, 306 S.W.3d at 781. With that framework in mind, we turn to the present case.

Our first duty in analyzing a jury charging issue is to determine whether error exists. *Ngo*, 175 S.W.3d at 743. The record shows that the following exchange took place during the trial court's charge conference:

| THE COURT: | [ . . . . ] I need to start with what lessors [sic], if any, is Defense [sic] requesting in the charge. |
| --- | --- |
| [DEFENSE COUNSEL]: | No lessers [sic]. We're not requesting any lesser-included offenses. |
| THE COURT: | Is the State requesting any lesser-included offenses in the charge? |
| [STATE'S PROSECUTOR]: | No, Your Honor. |

Lopez argues that the trial court erred by not *sua sponte* instructing the jury on the lesser-included offense of felony murder. We disagree. A trial court has no duty to *sua sponte* instruct the jury on lesser-included offenses absent a request by the defense for

16

its inclusion. *See Tolbert*, 306 S.W.3d at 781. It is clear that neither party requested a lesser-included offense to be included in the charge from the trial court. Therefore, because no error exists, our analysis ends here. *See Ngo*, 175 S.W.3d at 743. We overrule Lopez's second issue.

### IV. SUFFICIENCY OF THE EVIDENCE

By her third and fourth issue, which we combine, Lopez challenges the sufficiency of evidence related to her criminal liability under the law of parties.

### A. Applicable Law and Standard of Review

We apply the standard articulated in *Jackson v. Virginia* to determine whether the evidence is sufficient to support a criminal conviction. 443 U.S. 307, 319 (1979); *see Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality op.) (holding that the *Jackson* standard of review is the "only standard" that should be applied in a sufficiency review). Under *Jackson*, we examine the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. 443 U.S. at 319.

The elements of the offense are measured as defined by a hypothetically correct jury charge. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App.1997)). Such a charge [is] one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Villarreal*, 286 S.W.3d at 327.

17

We defer to the jury's determinations of credibility and weight to be given to the evidence because jurors are the sole fact-finders. *See Brooks*, 323 S.W.3d at 899; *see also* TEX. CODE CRIM. PROC. ANN. art. 38.04 (West 1979) ("The jury, in all cases, is the exclusive judge of the facts proved, and of the weight to be given to the testimony. . . ."). Each fact need not point directly and independently to the guilt of Lopez, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Hooper v. State*, 214 S.W.3d 9, 13 (2007). Specifically, to determine whether an individual is a party to an offense, we look at "events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." *Gross v. State*, 380 S.W.3d 181, 186 (Tex. Crim. App. 2012); *see Hooper*, 214 S.W.3d at 13. Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, or party status, and circumstantial evidence alone can be sufficient to establish guilt. *See Gross*, 380 S.W.3d at 186; *Hooper*, 214 S.W.3d at 13.

## B. Discussion

Lopez argues that the evidence is insufficient to establish her guilt as a party under penal code section 7.02(a)(2) and/or under penal code section 7.02(b). *See* TEX. PENAL CODE ANN. § 7.02(a)(2), (b) (West 2011). We address each argument in turn.

In this case, the State charged Lopez under what is commonly referred to as the "law of parties" to hold her responsible for Rousseau's murder that was allegedly committed by Garza. While the presence of the accused at the scene of the crime is not alone sufficient to prove that person is a party to the crime, it is a circumstance tending to prove guilt, which, combined with other facts, may suffice to show that the

18

accused was a participant. *Escobar v. State*, 799 S.W.2d 502, 506 (Tex. App.—Corpus Christi 1990, writ ref'd) (citing *Beardsley v. State*, 738 S.W.2d 681, 685 (Tex. Crim. App. 1987)). Moreover, in determining whether the accused participated as a party, the trial court may look to events before, during and after the commission of the offense, and may rely on actions of the defendant which show an understanding and common design to do the prohibited act. *Escobar*, 799 S.W.2d at 506 (citing *Cordova v. State*, 689 S.W.2d 107, 111 (Tex. Crim. App. 1985) (en banc)).

Accordingly, a hypothetically correct capital murder jury charge in this case would state that Lopez is guilty if a jury finds beyond a reasonable doubt that either as a principal actor, as a party under section 7.02(a)(2), or as a co-conspirator under section 7.02(b), Lopez intentionally caused Rousseau's death by hitting her with a bat, and that Rousseau's death took place in the course of, or attempting to commit, burglary of Rousseau's home.[3] Because the charge authorized the jury to convict on alternative theories, the verdict of guilt will be upheld if the evidence was sufficient on any one of the theories. *Sorto v. State*, 173 S.W.3d 469, 472 (Tex. Crim. App. 2005).

First, the evidence sufficiently shows that a capital murder was committed. The evidence shows that Rousseau was brutally beaten with a baseball bat, as illustrated by the trauma inflicted to her body, as well as blood splatter that covered the walls near where her body was found. Furthermore, Dr. Fernandez, the medical examiner, testified that Rousseau's body had multiple contusions and abrasions throughout the body, including her face, multiple skull fractures, and contusions to the left side of her

---

[3] A person commits burglary of a habitation if without the effective consent of the owner, the person (1) enters a habitation, not then open to the public, with intent to commit a felony, theft, or an assault; or (2) remains concealed, with intent to commit a felony, theft, or an assault, in a habitation; or (3) enters a habitation and commits or attempts to commit a felony, theft, or an assault. *See* TEX. PENAL CODE ANN. § 30.02 (West 2011).

19

brain. Furthermore, Dr. Fernandez's undisputed testimony stated that Rousseau's cause of death was blunt head trauma caused by homicide. The evidence also shows that Rousseau's murder was committed in the course of the commission of a burglary of her home. According to the evidence: the phone cable to Rousseau's trailer was severed; her front door frame was damaged, indicating a forced entry; and Rousseau's baseball bat was for self protection, which lends itself to the conclusion that Rousseau did not know her visitor, or was not expecting anyone.

### 1. Section 7.02(a)(2)

Next, we turn to Lopez's sufficiency challenge under penal code section 7.02(a)(2). Under section 7.02(a)(2), a person is criminally responsible pursuant to the law of parties if:

> acting with intent to promote or assist the commission of the offense, [the defendant] solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.

TEX. PENAL CODE ANN. § 7.02(a)(2).

As a starting point, "proof of motive is admissible as a circumstance indicating guilt." *Miranda v. State*, 813 S.W.2d 724, 733 (Tex. App.—San Antonio 1991, writ ref'd). In this case, Lopez's motive to kill Rousseau was apparent leading up to Rousseau's murder. Lopez's ex-boyfriend/lover, Peña, began dating Rousseau shortly after his ten-year relationship with Lopez ended. Following the breakup, Lopez sent Rousseau incoherent and threatening letters, which referenced Rousseau's relationship with Peña. The evidence also showed that Lopez drove her vehicle in and around the Oasis Trailer Park, where Rousseau lived. Testimony also shows that Rousseau became so concerned with Lopez's behavior that she moved trailer lots. Lopez was

also aware that Rousseau had moved trailer lots. Furthermore, Lopez told Ranger Pauska that she had wished Rousseau was dead.

Next, Lopez admitted to Ranger Pauska that she had twice driven by Rousseau's trailer on the night of the murder—the first time with Garza, and the second time alone. Lopez stated that both times, she went looking for Peña to inquire about his Camaro. However, the evidence shows that Lopez knew Peña was at work that night and not at Rousseau's trailer home. Furthermore, Lopez told Ranger Pauska that she did not "care for Garza," but drove him around Kingsville to three locations on the night of Rousseau's murder. Lopez also stated during her interview that Garza told her that he and a friend were "going to get stuff" at the trailer park.

The record also shows that following Rousseau's murder, Lopez misled police by lying to investigators about Garza, as well as providing false tips to the Kingsville Crimestoppers hotline. Lopez initially denied to Corporal Frost that she was in the area of the Oasis Trailer Park on the night of the murder. Lopez also told Corporal Frost that Garza was someone who was interested in buying Peña's Camaro, and nothing more. Lopez later retracted both of these assertions during her interview with Ranger Pauska in 2010. Lopez justified her change-in-story by explaining that she was "afraid" to tell Corporal Frost that she had been with Garza because her car had smelled like alcohol. Further, the evidence shows that Lopez made several anonymous phone calls to the Kingsville Crimestoppers tip line and gave police the name of a subject, "Ricky Segura," who police could never identify or locate. Kingsville detectives later identified Lopez as the caller, when police officers found her using a payphone to make one of the calls. Providing false statements indicate a consciousness of guilt and an

attempt to cover up a crime. *See King v. State*, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000) (considering defendant's false statements to the media in its sufficiency analysis); *Couchman v. State*, 3 S.W.3d 155, 163–64 (Tex. Crim. App. 1999) (holding that defendant's changing of his story is evidence of consciousness of guilt).

To summarize, the evidence shows that a rational jury could have found (1) Rousseau was intentionally beat to death with a baseball bat in the course of, or during an attempting to commit, burglary of Rousseau's home; (2) Lopez had a motive to kill Rousseau; (3) Lopez was present with Garza at the trailer park on the night of the murder; and (4) Lopez lied and provided false information to police following the murder to indicate a consciousness of guilt. Accordingly, after viewing this evidence in a light favorable to the verdict, we conclude that a rational jury could have found Lopez guilty of capital murder under penal code section 7.02(a)(2) beyond a reasonable doubt. *See Escobar v. State*, 799 S.W.2d at 506.

### 2. Section 7.02(b)

As noted in the previous section of this opinion, we conclude that a rational jury could have found Lopez guilty of capital murder under section 7.02(a)(2). However, even if the evidence supports Lopez's argument that she did not intend for Rousseau's murder to occur, the evidence nevertheless supports Lopez's conviction under section 7.02(b).

Under penal code section 7.02(b), one is criminally responsible under the law of parties if:

> [I]n the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one

22

that should have been anticipated as a result of the carrying out of the conspiracy.

*Id.* A person commits criminal conspiracy if he has the intent to commit a felony, agrees with another to engage in conduct that would constitute the offense, and performs an overt act in pursuance of that agreement. *Id.* § 15.02(a) (West 2011).

Rousseau's murder took place in the late evening/early morning hours of December 5-6, 2003. Evidence shows that Rousseau was awake at the time of her murder. Police found Rousseau's Crock Pot on and in use, as well as an open book face-down on the top of her bed. The record also shows that Rousseau's telephone cable was severed, which is probative to show that the perpetrator knew that someone was inside of the trailer. The evidence also shows that the perpetrator was uninvited as shown by the damage to the door frame of Rousseau's trailer. Accordingly, we conclude that the evidence is sufficient to show that a burglary of Rousseau's habitation was committed. The underlying intent of the burglary, *see* TEX. PENAL CODE ANN. § 30.02 (West 2011), is irrelevant to this analysis, because burglary of a habitation "provides a particularly high potential for violence." *Hughes v. State*, 897 S.W.2d 285, 293 (Tex. Crim. App. 1994); *see generally Leocal v. Ashcroft*, 543 U.S. 1, 10 (2004) ("[B]urglary, by its nature, involves a substantial risk that the burglar will use force against a victim in completing the crime."). Due to this high potential for violence, it is reasonable for a jury to conclude that even if Lopez had no intent to murder Rousseau, it was nevertheless a crime that should have been anticipated in light of the particularly high potential for violence of burglary of a habitation.

Therefore, after viewing this evidence in a light favorable to the verdict, we conclude that a rational jury could have found Lopez guilty of capital murder under penal

code section 7.02(b) beyond a reasonable doubt. Lopez's third and fourth issues are overruled.

## V. INEFFECTIVE ASSISTANCE OF COUNSEL

By her final issue, Lopez contends that trial counsel rendered ineffective assistance of counsel by failing to move to quash her indictment.

### A. Applicable Law and Standard of Review

We evaluate claims of ineffective assistance under the standards set forth by the United States Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 687 (1984). *See Jaynes v. State,* 216 S.W.3d 839, 851 (Tex. App.—Corpus Christi 2006, no pet.). Under the *Strickland* standard, appellant must show by a preponderance of evidence that: (1) trial counsel's representation fell below an objective standard of reasonableness; and (2) there is a reasonable probability that the result of the proceeding would have been different but for the attorney's deficient performance. *Strickland,* 466 U.S. at 687; *Jaynes,* 216 S.W.3d at 851. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Ex parte Ellis,* 233 S.W.3d 324, 330–31 (Tex. Crim. App. 2007). If an appellant fails to prove one prong of the test, we do not need to address the other prong. *See Strickland,* 466 U.S. at 697; *Garcia v. State,* 57 S.W.3d 436, 440 (Tex. Crim. App. 2001). The burden of proving this ineffectiveness rests upon the defendant by a preponderance of the evidence. *Rodriguez v. State*, 899 S.W.2d 658, 665 (Tex. Crim. App. 1995)).

When evaluating the quality of trial counsel's representation, we look to "the totality of the representation and the particular circumstances of each case in evaluating the effectiveness of counsel." *Thompson v. State,* 9 S.W.3d 808, 813 (Tex. Crim. App.

24

1999). "[A] single egregious error of omission or commission" can constitute ineffective assistance, but the Texas Court of Criminal Appeals has been hesitant to designate any particular error as per se ineffective assistance. *Id.* We apply "a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance." *Id.* Allegations of ineffectiveness must therefore be "firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness." *Id.* (citing *McFarland v. State,* 928 S.W.2d 482, 500 (Tex. Crim. App. 1996)). Direct appeal is usually inadequate to make an ineffectiveness claim because the record is frequently undeveloped. *Goodspeed v. State,* 187 S.W.3d 390, 392 (Tex. Crim. App. 2005). This is especially true where the claimed error is one of omission and "counsel's reasons for failing to do something do not appear in the record." *Id.*

The Texas Court of Criminal Appeals has explained that "trial counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective." *Rylander v. State,* 101 S.W.3d 107, 111 (Tex. Crim. App. 2003) (citing *Bone v. State,* 77 S.W.3d 828, 836 (Tex. Crim. App. 2002)). Unless counsel had an opportunity to explain his trial strategy, Texas appellate courts should "not find deficient performance unless the challenged conduct was 'so outrageous that no competent attorney would have engaged in it.'" *Goodspeed,* 187 S.W.3d at 392 (citing *Garcia v. State,* 57 S.W.3d 436, 440 (Tex. Crim. App. 2001)).

### B. Discussion

Lopez argues that her trial counsel provided ineffective assistance of counsel by failing to file a motion to quash the State's superseding indictment, or otherwise seek to clarify the underlying offenses comprising the burglary, and, as a result, the State

25

surprised counsel by expanding the basis for conviction in the jury charge.

Lopez's capital murder indictment alleged that she "did then and there intentionally cause the death of individual, namely, Susan Rousseau, by hitting her with a bat, and the defendant was then and there in the course of committing or attempting to commit the offense of burglary of a habitation of Susan Rousseau, who was the owner of said building . . . ." Under the penal code, a person commits burglary of a habitation if without the effective consent of the owner, the person (1) enters a habitation, not then open to the public, with intent to commit a felony, theft, or an assault; or (2) remains concealed, with intent to commit a felony, theft, or an assault, in a habitation; or (3) enters a habitation and commits or attempts to commit a felony, theft, or an assault. *See* TEX. PENAL CODE ANN. § 30.02 (West 2011). The indictment, as Lopez points out, did not specifically allege which burglarious intent Lopez had when she committed this offense. However, it is a well-known rule that the State is not required to plead the constituent elements of the offense constituting the aggravating feature of capital murder, even in the face of a motion to quash. *See Alba v. State*, 905 S.W.2d 581, 585 (Tex. Crim. App. 1995) (en banc); *Ramirez v. State*, 815 S.W.2d 636, 642 (Tex. Crim. App. 1991) (en banc); *Marquez v. State*, 725 S.W.2d 217, 236 (Tex. Crim. App. 1987), *overruled on other grounds by Moody v. State*, 827 S.W.2d 875, 892 (Tex. Crim. App. 1992); *Kitchens v. State*, 279 S.W.3d 733, 736 (Tex. App.—Amarillo 2007, pet. ref'd) (internal citations omitted).

Accordingly, even assuming that Lopez's trial counsel's failure to file a motion to quash the State's superseding indictment fell below an objective standard of reasonableness, we cannot conclude that there is a reasonable probability that the result

26

of the proceeding would have been different but for the attorney's deficient performance, because such a motion would not have been successful under the rule cited above. *See Alba*, 905 S.W.2d at 585. Accordingly, Lopez's final issue is overruled.

## VI. CONCLUSION

We affirm the trial court's judgment.

_____
GINA M. BENAVIDES,
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed the
26th day of November, 2013.